

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

January 16, 2018

**BY ECF**
The Honorable Nelson S. Román
United States District Judge
United States District Courthouse
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

    Re:    **United States v. Matthew Draper**
            **17 Cr. 226 (NSR)**

Dear Judge Román:

    The Government respectfully submits this memorandum concerning the sentencing of defendant Matthew Draper scheduled to take place on January 19, 2018 at 11:30 a.m. For the reasons set forth below, this Court should impose a sentence within the range of 108 to 135 months' imprisonment recommended under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), the parties' plea agreement, and the Presentence Report ("PSR").

    **I.**     **Offense Conduct**

    In February 2016, law enforcement agents from the Drug Enforcement Administration ("DEA") began investigating a drug trafficking organization (the "DTO") operating in and around the Southern District of New York, in particular, Haverstraw, New York, that was responsible for the transportation of resale quantities of cocaine and heroin into the United States from the Dominican Republic. (PSR ¶ 9.) In connection with the investigation of the DTO, law enforcement began working with a confidential source ("CS-1") who had several discussions with the defendant (in person, over the telephone, and via text). (*Id.* at ¶ 10.)

    On or about February 25, 2016, CS-1, acting at the direction of law enforcement, met with the defendant in the Bronx, New York, in order to discuss the transportation of approximately three kilograms of cocaine scheduled to arrive at John F. Kennedy Airport ("JFK") from the Dominican Republic. CS-1 and the defendant discussed, among other things, how much CS-1 would charge to transport the drugs, where to meet once CS-1 had the drugs in his possession, and why the defendant did not pick the drugs up himself. During the meeting, the defendant also explained to CS-1 that the defendant had been working with suppliers from the Dominican Republic since 1989 and that the defendant was looking for someone in the United States to help him retrieve his drug shipments. (*See id.* at ¶ 12.)

On or about August 6, 2016, CS-1, acting at the direction of law enforcement, introduced a second confidential source ("CS-2") to the defendant. The defendant and CS-2 exchanged phone numbers. (*Id.* at ¶ 13.) On or about September 3, 2016, the defendant and an unidentified co-conspirator ("CC-1"), called CS-1 from the Dominican Republic. During that conversation, CS-1 explained to CC-1 that he charged approximately $4,000 per kilogram of cocaine as a transportation fee. (*Id.* at ¶ 14.) CS-1 also explained to CC-1 how to package the cocaine for the flight. On or about September 12, 2016, CS-1 and CC-1 discussed the transportation of cocaine being sent to New York City on a JetBlue flight from the Dominican Republic. (*Id.* at ¶ 15.)

On September 21, 2016, CS-1 met with the defendant in the Bronx, New York. During the meeting, the defendant stated to CS-1 that CC-1 intended to transport approximately 2,000 kilograms of cocaine to the United States from the Dominican Republic. Later in the conversation, the defendant called CC-1 in the Dominican Republic and placed CC-1 on speaker phone. The defendant, CS-1, and CC-1 then discussed the logistics for carrying out the retrieval of cocaine shipments. (*See id.* 16.) On or about September 29, 2016, CC-1 alerted CS-1 via blackberry text message that the shipment was ready to be sent on October 4, 2016. (*Id.*) On or about October 4, 2016, CC-1 and CS-2 exchanged a series of text messages discussing the shipment, including the fact that the flight had been changed, and that the shipment would include "20 girls," which was street slang for 20 kilograms of cocaine. (*see id.* at ¶ 17.)

On or about October 5, 2016, CS-1 received a blackberry text message from CC-1 with a photo of the luggage containing the cocaine. That same day, law enforcement agents seized from a JetBlue flight that originated in the Dominican Republic luggage matching the luggage from the picture that CC-1 sent to CS-1, which contained approximately 20 kilograms of cocaine. (*Id.* at ¶ 18.) Later that day, CS-1 sent a blackberry text message to CC-1 stating that CS-1 had retrieved the shipment. CC-1 advised CS-1 to contact the defendant for pickup and payment. (*Id.* at ¶ 19.) CS-1 and the defendant arranged to meet at a location in Yonkers, New York. The defendant was arrested at the location shortly after meeting with CS-1. (*Id.*)

Law enforcement agents searched the defendant's vehicle and recovered a yellow bag containing approximately $22,500 and one kilogram of cocaine. (*Id.* at ¶ 20.) On or about October 6, 2016, law enforcement agents conducted a search at the defendant's residence located at 146 Halgren Crescent, Haverstraw, New York. During a search of the defendant's home, law enforcement agents recovered an additional half-kilogram of cocaine. (*Id.* at ¶ 21.)

## II. The Applicable Guidelines

The parties' plea agreement and the PSR provide that under the Guidelines, the sentencing range applicable to the defendant is 108 to 135 months' imprisonment, with a mandatory minimum term of 120 months' imprisonment, based on the more than 15 kilograms of cocaine that the defendant was responsible for distributing during the period covered by the Indictment. (*Id.* at ¶ 6.)

### III. Discussion

#### A. Applicable Law

After computing the advisory Guidelines range, courts consider the factors outlined in Title 18, United States Code, Section 3553(a). Among other things, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

#### B. A Sentence of 108 to 135 Months' Imprisonment Would Be Sufficient, but Not Greater Than Necessary, to Achieve the Legitimate Purposes of Sentencing

Drapers conduct fully merits a Guidelines sentence. He was a prolific cocaine supplier, operating at the higher-level of a sophisticated drug-trafficking network responsible for shipping kilogram quantities of cocaine from overseas. Draper was tasked, at least in part, with managing the actual transportation of the cocaine from the Dominican Republic to New York. Once the cocaine was here, Draper further distributed the cocaine to resellers who, in turn, flooded the lower Hudson Valley with cocaine. Indeed, in order to understand the magnitude of Draper's operation, one need only examine the instant criminal conduct. In just one transaction, Draper and his co-conspirators smuggled *20 kilograms* of cocaine into New York. Accordingly, a Guidelines sentence is warranted here "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."

Draper also derived significant profits from his crimes. Indeed, Draper made enough money to pay CS-1 thousands of dollars for retrieving the cocaine from the airport. Specifically, it is the Government's understanding that the approximately $22,500 recovered from Drapers vehicle at the time of his arrest, represented partial payment for CS-1's services as Draper's drug courier. Furthermore, one kilogram of cocaine is worth several thousand dollars. Here, Draper made enough money to purchase not one but 20 kilograms of cocaine at once, have them flown to the United States, and pay a third-party several thousand dollars to pick the drugs up on his behalf. Once broken down and distributed to resellers, Draper stood to make a significant profit—even assuming that wholesale distributors like Draper did not dilute their cocaine before reselling it. A

Guidelines sentence is thus also necessary to deter profitable criminal conduct like Drapers. *See* 18 U.S.C. § 3553(a)(2)(B).

The need for specific deterrence with respect to Draper is even clearer than in other cases. As Draper indicated to CS-1 he has been involved in drug trafficking since the late 1980's and has sustained at least two convictions for narcotics trafficking. More broadly, a Guidelines sentence is necessary to instill in Draper a sense of respect for the law and law enforcement. Including his two narcotics convictions, Draper has sustained eight convictions for various crimes, including: (i) criminal possession of a controlled substance, (ii) criminal possession of a weapon, (iii) criminal possession of a loaded firearm, and (iv) criminal possession of a controlled substance. If nothing else, these convictions demonstrate that Draper is a defendant who is not easily deterred. Indeed, several convictions, a supporting wife, children, and grandchildren were collectively insufficient to prevent Draper from engaging in the instant criminal conduct. A sentence within the Guidelines range of 108 to 135 months' imprisonment, however, will hopefully succeed where Draper's previous convictions have failed.

For similar reasons, a Guidelines sentence is also warranted to protect the public from further crimes by the defendant. *See* 18 U.S.C. § 3553(a)(2)(C). Draper played a significant role in Rockland County's preeminent drug distribution network for years, supplying wholesale amounts of cocaine that likely fueled gang-affiliated, street-level crack dealers and countless addictions in and around the lower Hudson Valley. In light of the damage drug addiction has inflicted on victims and family members alike, Draper can hardly dispute the manifest need to protect the public from a supplier like him. And Draper has already made clear that lesser sentences will not provide that protection. With respect to his state convictions, Draper's longest sentence was for three to six years (36 to 72 months) – for which he actually served less than two years. And, despite multiple felony convictions, Draper continued to distribute wholesale quantities of cocaine. To be sure, this Court cannot reasonably hope that giving Draper another lenient sentence will adequately protect the people of this District from his crimes.

In a bid to avoid the consequences of his crimes, Draper casts himself as a devoted husband, father, and grandfather who cares about nothing as much as he cares about his family. (*See* Defendant's Submission, Dkt. 17 ("Def. Sub.") at 4-7.) But to be clear, while it is refreshing that Draper has people willing to support him despite his criminal conduct, and while it is the Government's hope that these individuals help Draper lead a law-abiding life when he completes his sentence, it is important to point out that Draper sold substantial amounts of cocaine fully aware of how his actions would hurt those who love him. That is because drug dealers like Draper are inherently selfish. Drug dealers, by definition, profit from their customers' addiction. Draper is no different. He deliberately nurtured devastating drug habits and supplied drug dealers for financial gain, giving little thought to the customers themselves and their families and friends who also suffered. Worse, Draper gave little thought to how his actions would affect his own loved ones.

Other claims in the defendant's submission should similarly be taken with a grain of salt. For example, Draper points out that, at the time of his arrest, he worked at a liquor store owned by his wife. (Def. Sub. at 7.) Based on information uncovered during the course of this investigation, the Government believes that, despite the fact that the liquor store did make legitimate sales, it

also served as a front for Draper's narcotics distribution business. Draper's claim is thus rather hollow and certainly does nothing to change the fact that he was a large-scale drug dealer.

In sum, Draper was a prolific drug supplier who helped flood his community with cocaine in order to enrich himself. His attempts to portray himself as anything else call into question the genuineness of his acceptance of responsibility for his actual conduct. This Court should impose a Guidelines sentence to reflect the seriousness of Draper's conduct, deter him and those who would follow in his footsteps, and protect the community from his repeat involvement in drug trafficking.

### Conclusion

For the foregoing reasons, this Court should impose a Guidelines sentence of 108 to 135 months' imprisonment.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

by: /s/ Christopher J. Clore
Christopher J. Clore
Assistant United States Attorney
(914) 993-1918